COX v. THE ATCHISON, TOPEKA & SANTA FE RAILROAD COMPANY, *Appellant.*

Division Two, May 21, 1895.

1. **Railroad**: KILLING STOCK: FENCE. Plaintiff, in an action against a railroad to recover double damages for killing his cows, having made a *prima facie* case by showing that the cows were killed on defendant's track where it was not fenced, the burden is on defendant of showing, as an excuse for not fencing the track, that a fence would have endangered the lives and limbs of defendant's employees engaged in switching.

2. ——: ——: CATTLE GUARDS: QUESTION OF FACT. Whether the company could have maintained cattle guards nearer the station, adjacent to which the accident occurred, without endangering the safety of the company's employees was, under the evidence in this case, a question for the jury.

3. Supreme Court Practice: MOTION: RECITAL OF FACTS. Recital of facts in a motion to quash a panel of jurors is no evidence of the existence of such facts, and the supreme court will not, in the absence of evidence establishing them, review the action of the trial court in overruling the motion.

*Appeal from Jackson Circuit Court.*—HON. E. L. SCARRITT, Judge.

AFFIRMED.

*Gardiner Lathrop* and *Samuel W. Moore* for appellant.

(1) The law providing for the selection of petit juries in counties containing a city of more than fifty thousand and less than three hundred thousand inhabitants (acts of 1891, p. 172), is in violation of section 53 of article 4 of the constitution of this state, which prohibits special or local legislation in reference to the "summoning or impaneling grand or petit juries." *State ex rel. v. Miller*, 100 Mo. 438; *State ex rel. v. Board*, 89 Mo. 237; *Rutherford v. Heddens*, 82 Mo. 388; *State v. Kring*, 74 Mo. 612; *State ex rel. v. Hammer*, 42 N. J. L. 436. (2) Where, as here, the undisputed testimony is that the point where the animals went upon the track could not be fenced without endangering the lives and limbs of employees in the transaction of the company's business at the station, the court should direct a verdict for the defendant. *Pearson v. Railroad*, 33 Mo. App. 543; *Jennings v. Railroad*, 37 Mo. App. 651; *Railroad v. Willis*, 93 Ind. 507; *Kneadle v. Railroad*, 19 Am. and Eng. R. R. Cases, 568; *Lloyd v. Railroad*, 49 Mo. 199; *Allen v. Railroad*,

5 Am. and Eng. R. R. Cases, 620; *Snow v. Railroad,* 8 Allen, 441; *Lewis v. Railroad,* 59 Mo. 495; *Crenshaw v. Railroad,* 54 Mo. App. 233; *Wright v. Railroad,* 56 Mo. App. 367; *Grant v. Railroad,* 56 Mo. App. 66; *Webster v. Railroad,* 57 Mo. App. 451. (3) On duty to direct a verdict. *Morgan v. Durfee,* 69 Mo. 469; *Jackson v. Hardin,* 83 Mo. 185; *Fitzgerald v. Barker,* 96 Mo. 666; *Landis v. Hamilton,* 77 Mo. 534; *Powell v. Railroad,* 76 Mo. 80; *Reichenbach v. Ellerbe,* 115 Mo. 595.

*J. A. Prewitt* for respondent.

(1) The act of the legislature (Acts, 1891, page 172) providing for the selection of petit juries in counties containing, or which may hereafter contain, a city of more than fifty thousand inhabitants and less than three hundred thousand inhabitants is not in violation of section 53, article 4, of the constitution of this state, which prohibits special or local legislation in reference to summoning or impaneling grand or petit juries. *Lynch v. Murphy,* 119 Mo. 164; *State ex rel. v. Miller,* 100 Mo. 438; *Rutherford v. Hamilton,* 97 Mo. 543; *Ex Parte Swann,* 96 Mo. 44; *State ex rel. v. Pond,* 93 Mo. 606; *State v. Hayes,* 88 Mo. 347; *Ewing v. Hoblitzelle,* 85 Mo. 64; *Rutherford v. Heddens,* 82 Mo. 388; *State ex rel. v. Tolle,* 71 Mo. 645. (2) Plaintiff, upon his testimony, was *prima facie* entitled to recover in his action. *Lepp v. Railroad,* 87 Mo. 139; *Morris v. Railroad,* 58 Mo. 78; *Wymore v. Railroad,* 79 Mo. 247; *Chouteau v. Railroad,* 28 Mo. App. 556; *Russell v. Railroad,* 26 Mo. App. 368. The trial court committed no error in refusing to direct a verdict for the defendant in this case. (3) Where, as here, exemption from liability is claimed on the ground that the railroad company could not have fenced its right of way at the point

where the animals came upon the track without endangering the lives and limbs of its employees in the transaction of the company's business, the burden of proving the necessity for leaving its tracks unfenced and unguarded is cast upon the railroad company. *Hamilton v. Railroad*, 87 Mo. 85. And the issue on that point being a mixed question of law and fact, must be submitted to the jury. *Crenshaw v. Railroad*, 54 Mo. App. 236; *Bean v. Railroad*, 20 Mo. App. 641. And whether or not the necessity exists is not left to the discretion of the railroad company. (4) Where, as here, there is a conflict in testimony on that point, whether the conflict is direct or inferential, when considering the testimony in the whole the issue should be submitted to the jury. *Johnson v. Railroad*, 27 Mo. App. 379; *Straub v. Eddy*, 47 Mo. App. 189; *Pearson v. Railroad*, 33 Mo. App. 543.

GANTT, P. J.—This is an action to recover double damages for killing two cows, the property of plaintiff, by the locomotive and cars of the defendant. Two questions were presented for review: *First*, the constitutionality of the act of 1891, providing for the selection of petit jurors in counties containing more than fifty thousand and less than three hundred thousand inhabitants; *secondly*, the action of the trial court in refusing to direct a verdict for defendant upon the testimony.

I. If defendant is right in its claim that a demurrer to the evidence should have been sustained, then the constitution of the jury will be immaterial.

The plaintiff offered evidence of his ownership; that the cows were in his pasture near the railroad track; that they tore down the fence about two hundred yards from the track; that the road was unfenced where they got on the defendant's track; that the cow was reasonably worth $75 and the heifer, $50. Indeed,

there is very little conflict in the evidence, except upon one point, and that was whether or not defendant could have erected and maintained fences and cattle guards any nearer Courtney station than they were erected at the time of the injury to plaintiff's cattle, and at the same time have avoided endangering the lives of its employees operating its trains.

Plaintiff testified on direct examination:

"I noticed some cow tracks coming up on the railroad right of way. I detected it very plainly. There had been a rain and you could see where they went down on that dirt, that top dirt where they had been walking in the fresh fill. That was uninclosed land; some in cultivation and some of it in weeds. I found one of the cows lying on the south side of the track and the other was dragged right up here" (indicating on plat). "It is a quarter of a mile, I guess, from the station of Courtney down there, very nearly—somewhere along there. I could not say exactly, but it is a long ways. And right about here" (indicating on the plat) "the road *put in cattle guards since the cattle were killed.* There were no streets or public crossings at the point where the cows were killed. The cows were killed in Blue township, Jackson county, Missouri."

On cross-examination, plaintiff testified:

"There is a pit dug out, I suppose it is a cattle guard, on the east at Mr. Stewart's, where the fence begins. *They are not cattle guards; they are just ditches. A dug out place, maybe, for cattle guards, I reckon; I don't know what you call it: it is a dug out place—a sink hole.* The cows were not struck by the train inside the switch. Courtney has three houses in it. They have no mayor. There are two families living there besides the depot. There are no streets crossing the track at Courtney. The public road crosses here, and at the stock yards is a little place to cross—a man fixed it up

himself.  If there are any streets laid out,.they are not opened.  There was no scale track at Courtney, *and the yards were not built when my cattle were killed.*  The cattle were killed a few feet east of where the end of the house track now is.  *It was not there when they were killed.*"

On redirect examination plaintiff testified:

"The tracks were found by me going on the railway right of way east of the switch, and the cattle were found about one third the way from the terminus of the switch to the cattle guard or sink hole on the east. It is about one hundred and forty yards from the terminus of the switch to where the fence begins.  The land where the tracks were seen is open.  There is open land between Stewart's and the switch; there is a big place in there—farmers use it; it is not fenced.  They came up here before they got to the track.  This is the place" (indicating on plat) "where they come along; blood was sprinkled on the rails.  The old cow was lying across the south side.  You could see the blood on the ties.  It looked like they dragged the heifer; she was up over there on the north side.  We traced the blood before we reached the long switch.  I had a contract with Mr. Courtney.  I rented his farm."

B. F. Bush testified for plaintiff, on direct examination, as follows:

"I know something about the circumstances of the killing of the two cows belonging to G. L. Cox.

"*Q.* Is this a correct plat of the location of the ground of the railroad switches, etc., around Courtney? *A.* That seems to be pretty correct.

"*Q.* Whereabouts was it, with reference to the railroad track, you found those cows? *A.* The one that was dead was lying on the left hand side of the track, right about where the switch here sets in.  The

other one was lying just between the house switch and the main track on the side.

"*Q.* Just indicate where you found the old cow; make a litle mark, so that it can be identified afterwards? *A.* The cow was lying on that side. I don't know whether she was knocked off from the road; she was lying there, dead. The other one was just inside the house track. She was lying right there," (indicating). "It is probably fifty or sixty yards from the terminus of the long switch to the cattle guards on the east. It is all open land from the cattle guards on the east. I got there one half or three quarters of an hour after the cattle were killed, and Mr. Cox was there. We went to see where the cows had been killed and where they had been walking and everything. There had been a rain a short time before that and the ground was soft and we saw the tracks where they had walked up the railroad track and where they had got on the railroad track on the south side of the track. They had got on the ground where there was not any fence enclosing. We could see where they walked through the weeds and through the brush. They had come out and got on the railroad track and were walking on the railroad track up towards the depot."

On redirect examination, B. F. Bush testified:

"There is no other street or alley across the railroad track, except the main road that comes into Courtney—the county road—that crosses at the station, right at the end of the platform. There are now four houses in Courtney and inhabitants not to exceed twenty. They do not ship anything from Courtney, unless it is wood from the river. The business done there is simply their own business—switching cars—railroad business."

Barney Doyle, witness for defendant, testified on cross-examination:

"I am section foreman of the Santa Fe at Courtney. It is three thousand feet, I guess, from Courtney station to the east cattle guards. It is nearly three thousand feet from Courtney to the terminus of the long switch. It is about four hundred feet from Courtney station to the terminus of the house switch. I found the heifer about three hundred and fifty feet from the station and the old cow about four hundred feet from the station, about the end of the house switch. There is no public crossing on the railroad track between the crossing at the depot platform and the terminus of the switch. There is a blind crossing used by farmers; it is not a public crossing. The cows were killed about two hundred feet west of the public crossing. I made no examination whatever to find out where the cattle got on the railroad track."

S. D. Montrose, witness for defense, testified on cross-examination, in connection with the blue print introduced by defendant:

"*Q.* How far is it from the end of this switch to where the cattle guard is? *A.* It is about one hundred feet.

"*Q.* You say it is one hundred feet from here to this cattle guard. Have you not all the room you need from the end of that switch to the cattle guard? *A.* We don't do work up here.

"*Q.* Suppose you did work up here? *A.* These marks here represent a place we don't do work at. This is a passing track. This is our switch track down in here.

"*Q.* You testify to matters, now matters where you do do work? *A.* We do work in between these switches.

"*Q.* What was your testimony with reference to meeting trains there? *A.* I testified that this passing

track was used constantly for meeting and passing trains.

"*Q.* And you testify that one hundred feet from this track on the long switch down to the cattle guards on the east is not enough to do the work without endangering the lives of employees? *A. There is no work to be done here.*

"*Q.* That is enough to do it in if there is no work to be done? *A.* I never claimed there was any work done at this point."

On the other hand, defendant offered the testimony of section foreman Doyle, engineer Crane and freight conductors Montrose, Foster, Williams, Mendenhall and Padgett—men of from ten to thirty years' experience in the practical operation of freight and passenger trains. These witnesses testified that if the cattle guards at Courtney should be brought closer together, and wing fences built to connect with the right of way fences, it would be exceedingly hazardous to the train men who had occasion to handle trains at that station; that if the cattle guards were closer together the train men would be compelled to pass and repass over them, by day and night, in coupling and uncoupling cars, running ahead to throw a switch, and in running to catch the train after the switch had been closed and the train passed over; that the duties of a train man require him to run or walk along between the rails in making couplings, and that if cattle guards were permitted in the switch limits they would be pitfalls that would greatly increase the hazards incident to their employment; that wing fences in the switch limits would obstruct the view so that signals could not be seen; that to fence the right of way up to the point where the cattle went upon the right of way, and to construct cattle guards and wing fences (without which the right of way fences would be no protection against stock)

would require the construction of six cattle guards in the middle of the yards, which would be a hazard and a menace to every train man whose duties required him to handle a train at this station; that Courtney is an important station, having a day and night operator; that a great many trains meet and pass there; that the passing track and the scale track are in almost constant use; that in busy times as many as forty or fifty trains pass that station daily; that sometimes three and four trains will be there at one time.

I.    That plaintiff made a *prima facie* case that his cows were killed where the company's railroad was not fenced is very clear and the burden of showing as a reason for not fencing it because by so doing it would endanger the lives and limbs of its employees devolved upon defendant.

Defendant's witnesses all concurred in a general way in testifying that the cattle guards could not be drawn in closer without danger to the brakemen and switchmen operating trains at this station, but learned counsel seem to overlook that these witnesses testified as to the condition of the tracks, side tracks, switches and cattle guards as of the date of the trial, whereas plaintiff's right of recovery was based upon the conditions existing when his cattle were killed, nearly three years before the trial.   He testified, without contradiction, that the socalled east cattle guard was a mere hole in the ground, and that defendant had built additional switches and erected stock yards and a cattle guard near where the cattle were killed after they were killed.

So that, considering plaintiff's testimony on that point with the evidence as to the length of the switches, the distance between the cattle guards, the importance of the station, the conflict in the testimony as to the distance from the cattle guard on the east to the head of the passing switch; and that, according to defend-

ant's own evidence, the dangerous part of the work of the trainmen was performed on the house switch, which terminated four hundred feet east of the station, and the fence on the sides of the tracks began at a point three thousand feet east of the station, thus disclosing a physical fact which did not coincide with the rest of defendant's evidence, we are of the opinion that it was a question of fact which was properly left to the jury, under correct instructions from the court, and we accordingly rule the second point against defendant.

II.   At the March term, 1893, the defendant filed its motion to quash the panel of jurors, from which the jurors to try this cause must be selected, "for the reason that the county court of Jackson county, Missouri, had no authority under the laws of the state of Missouri, to draw or select a panel of jurors for the trial of causes in this court, and the pretended authority under which said court acted is contrary to the constitution of the state of Missouri, and the judge of this court had no authority under the said laws to order a panel of jurors to be drawn and selected by said county court or the clerk thereof;" which motion was, by the court, overruled.

The constitutionality of the law of 1891 providing for the impaneling of juries in counties having over fifty thousand inhabitants and less than three hundred thousand inhabitants has been questioned in several cases at this term of this court, but we can not see how we are to determine it upon this record.   The only thing that tends to show in the most remote degree how this jury was drawn is this motion to quash the panel, which recites that the county court had no authority to draw or select the panel.   Again and again this court has held that the recital of facts in a motion for new trial was no evidence of the existence of those

facts.   For similar reasons a motion to quash a panel of jurors is not evidence of the facts it recites.

If any evidence tending to prove how this jury was drawn was brought to the attention of the circuit court it has not been preserved in the bill of exceptions, and, for aught that appears in the transcript, that court may have overruled the motion because it was not supported by evidence that the jury had been drawn by the county clerk, or, if it had been, then not by virtue of the law of 1891.   The record does recite that twelve good and lawful men from the body of the county were duly impaneled, tried, chosen and sworn to try the cause.   No objection is made that either of said jurors was not qualified, and no improper conduct is charged against them.   To reverse a judgment upon such a showing as this would be to fly in the very teeth of the statute which forbids our reversing any judgment for error not "materially affecting the merits of the action." The judgment is accordingly affirmed.   BURGESS and SHERWOOD, JJ., concur.